IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| ALDE-BINET TCHATCHOU, | * | |
| Plaintiff, | * | |
| v. | * | Case No.: 8:18-cv-03396-PWG |
| INDIA GLOBALIZATION CAPITAL, INC., et al. | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| GABE HARRIS-CARR, | * | |
| Plaintiff, | * | |
| v. | * | Case No.: 8:18-cv-03408-GJH |
| INDIA GLOBALIZATION CAPITAL, INC., et al. | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Before me now are two separate but related lawsuits. The suits were filed on the same day and have two defendants in common: India Globalization Capital, Inc. ("India Globalization") and its president and chief executive officer, Ram Mukunda. Both suits accuse the company, Mukunda, and other company officials of misleading investors in violation of the Securities Exchange Act and Rule 10b-5.

1

A series of motions have been filed seeking to consolidate the cases, appoint a lead plaintiff, and select lead counsel. Having reviewed these motions and additional requested briefings, I am consolidating the cases, appointing the IGC Investor Group as lead plaintiff, and approving its selection of co-lead counsel.

**FACTUAL BACKGROUND**

India Globalization is a public company based in Bethesda, Maryland. Harris-Carr Compl. ¶¶ 3, 13, *Harris-Carr v. India Globalization Capital, Inc.*, No. 18-3408-GJH (D. Md. Nov. 2, 2018), ECF No. 1.[1] Its common stock trades on the NYSE American exchange. *Id.* ¶ 3. The company has two distinct businesses. Its primary business, according to the pleadings before me, is the "development and commercialization of cannabinoid-based alternative therapies for indications such as Alzheimer's disease, Parkinson's disease, and pain." *Id.* ¶ 18. Separately, the company continues to maintain a "legacy business that involves trading commodities and heavy equipment rental." *Id.*

The controversy between India Globalization and its investors can be traced to September 25, 2018, when the company issued a press release entitled, "IGC to Enter the Hemp/CBD-Infused Energy Drink Space." *Id.* ¶ 24. The press release announced the company had entered into a 10-year agreement for the right to market various products in North and South America, including a sugar-free energy drink called "Nitro G." *Id.* It appeared to indicate the deal involved a manufacturer in Malaysia. *Id.*

The announcement precipitated a meteoric rise in India Globalization's stock, from $2.33 per share on September 25, 2018, to $13 per share on October 2, 2018. *Id.* ¶ 25. But the

---

[1] All citations to the Complaint refer to the Complaint in *Harris-Carr v. India Globalization Capital, Inc.*, No. 18-3408-GJH. All other citations, unless otherwise indicated, refer to filings in *Tchatchou v. India Globalization Capital Inc.*, No. 18-3396-PWG.

2

bonanza was short-lived. On October 28, 2018, the financial news site Marketwatch published an article identifying several "red flags" about the company. *Id.* ¶ 27. In particular, the article reported that India Globalization had a history of announcing plans to enter into the "latest hot market" (for example, blockchain), that it had nevertheless "assigned very little funding to research and development," and that the SEC had been pressing the company to demonstrate compliance with stock exchange rules. *Id.* The article keyed in on the press release's suggestion (which may have been a triumph of chutzpah over common sense) that the company would work with a manufacturer in Malaysia, noting that "that country has a mandatory death sentence for cannabis possession and no medical marijuana program." *Id.*

As might be expected, amid this scrutiny, the company's stock price dropped "precipitously." Tchatchou Compl. ¶ 19, *Tchatchou v. India Globalization Capital Inc.*, No. 18-3396-PWG, ECF No. 1. The next day, October 29, 2018, NYSE American announced that it had commenced proceedings to delist India Globalization's common stock from the exchange and that all trading of the stock was immediately suspended. Harris-Carr Compl. ¶ 31. The announcement provided two bases for the decision. To begin, it said, the exchange's regulators had

> commenced delisting proceedings against the Company pursuant to [an NYSE American guideline] which states that where the issuer has substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical, it shall not be considered an operating company for the purposes of continued trading and listing on the Exchange.

*Id.* In addition, the regulators had concluded that "the Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest." *Id.*

3

Investors filed these two class action lawsuits on November 2, 2018. The respective complaints include identical claims. First, they accuse the company and various executives of making false or misleading statements in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5. Second, they accuse certain executives of aiding and abetting the fraud in violation of Section 20(a) of the Exchange Act.

The commencement of the litigation kicked off a competition among investors seeking to consolidate the two suits and to win appointment as lead plaintiff (and with it, of course, a competition among the various law firms hoping to represent them). Among the seven groups or individual investors who asked to be named lead plaintiff, five later withdrew their motions or filed a "non-opposition," acknowledging that other movants had larger financial stakes in the litigation and were therefore more likely to win appointment. *See* ECF Nos. 14-17, 23. The two remaining movants are Guita Bahramipour ("Ms. Bahramipour") and a seven-person group known as the IGC Investor Group ("IGC").

All issues have been briefed in full. *See* ECF Nos. 18, 21, 32, 33. No hearing is necessary. *See* Loc. R. 105.6.

### DISCUSSION

The Private Securities Litigation Reform Act (the "PSLRA") dictates the procedures a court must follow in resolving these motions. Under the statute, the court's first task is to address any motions for consolidation. *See* 15 U.S.C. § 78u-4(a)(3)(B)(ii). After that, the court may appoint a lead plaintiff (an action the statute directs the court to take "[a]s soon as practicable") and approve the selection of counsel. *See id.* I will proceed in that order.

## Consolidation

Six movants have filed motions to consolidate these cases. *See* ECF Nos. 14, 16-18, 21, 23. On January 10, 2019, I gave the parties and putative class members one week to file any responses in opposition to these motions. ECF No. 26. No one filed a response.

The principles governing the consolidation of securities fraud suits "are found not in the PSLRA, but in Rule 42" of the Federal Rules of Civil Procedure. *In re MicroStrategy Inc. Secs. Litig.*, 110 F. Supp. 2d 427, 431 (E.D. Va. 2000). Rule 42 gives a court discretion to consolidate actions that "involve a common question of law or fact." Fed. R. Civ. P. 42(a)(2). In exercising this discretion, the court "must consider the interest of judicial economy as well as the interest of the parties in a fair and impartial procedure." *In re MicroStrategy*, 110 F. Supp. 2d at 431. In that regard,

> courts considering whether to order consolidation must determine whether "the specific risks of prejudice and possible confusion from consolidation are overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned."

*Id.* (quoting *Arnold v. Eastern Air Lines Inc.*, 681 F.2d 186, 193 (4th Cir. 1982)).

Here, there is no question the two suits involve common questions of law and fact. Both complaints center on the company's statements in its September 25, 2018 press release, alleging these statements were part of a scheme to artificially inflate the stock price and defraud investors. *See* Tchatchou Compl. ¶¶ 18, 23; Harris-Carr Compl. ¶¶ 26, 44. On the basis of these allegations, the complaints assert identical legal claims.

To be sure, the suits are not without their differences. While both name India Globalization and Mr. Mukunda as defendants, each names at least one other defendant the other

does not.[2] The suits also propose different (but overlapping) class periods. Both suits would close the class period on October 29, 2018, when the NYSE American suspended all trading of the company's stock. *Tchatchou*, though, would have the class period start on September 26, 2018, the day after the company issued the press release announcing the deal to market the Nitro G energy drink. Tchatchou Compl. ¶ 1. *Harris-Carr*, by contrast, would start the class period earlier, on June 21, 2018, to include the date the company filed its annual Form 10-K report with the U.S. Securities and Exchange Commission ("SEC").

These distinctions are by no means fatal to the motions for consolidation. As this Court has previously explained: "Differences in class periods, parties, or damages among the suits do not necessarily defeat consolidation, so long as the essential claims and facts alleged in each case are similar." *In re Royal Ahold N.V. Secs. & ERISA Litig.*, 219 F.R.D. 343, 348 (D. Md. 2003). Consolidation is often appropriate, regardless, where the securities fraud actions "are based on the same public statements and reports." *Id.* That is the case here. And seeing as no putative class members have raised any concerns that consolidation might prejudice them, I can see no reason to keep the suits separate. It is my decision, accordingly, that these two suits are now consolidated.

### Lead Plaintiff

My next task is to appoint a lead plaintiff. The PSLRA instructs the district court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15

---

[2] *Tchatchou* names Board of Directors Chairman Richard Prins and Director and Compensation Committee Chairman Sudhakar Shenoy. *Harris-Carr* names Principal Financial Officer Claudia Grimaldi.

U.S.C. § 78u-4(a)(3)(B)(i). Under the statute, the court must adopt a presumption that the "most adequate plaintiff" (in PSLRA parlance) "is the person or group of persons that—

> (aa) has either filed the complaint or made a motion in response to a [PSLRA] notice . . . ;
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* § 78u-4(a)(3)(B)(iii). To rebut this presumption, a movant must show that the presumptively most adequate plaintiff either "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." *Id.* § 78u-4(a)(3)(B)(iii)(II).

Here, two movants remain in contention. Both filed motions in response to the PSLRA notice. What remains to be determined is which of the two "has the largest financial interest in the relief sought by the class," and whether that person or group "otherwise satisfies" the Rule 23 requirements. *Id.* § 78u-4(a)(3)(B)(iii)(bb)-(cc).

1.

As to the first of these issues, the PSLRA itself does not define the proper way to determine which movant has the "largest financial interest in the relief sought." In the absence of a statutory directive, many courts have applied a four-factor test: (1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs. *See* 7 William B. Rubenstein, Newberg on Class Actions § 22:42 (5th ed. 2017); *see, e.g., Foley v. Transocean, Ltd.*, 272 F.R.D. 126, 127-28 (S.D.N.Y. 2011). The fourth factor is widely considered the most important. *See Foley*, 272 F.R.D. at 128.

Turning, now, to the movants in this case, I begin with Ms. Bahramipour. She bought 30,000 shares on October 2, 2018, paying a total of $322,800. *See* ECF Nos. 18-5, 33-9. She did not sell even after the stock price plummeted, and as of January 2, 2019 – the day she filed her motion for appointment as lead plaintiff – her shares were worth just $22,500 all told, representing a loss of $300,300. *See* ECF No. 33-9.

The calculations for IGC are a bit messier, on account of the fact that IGC is a collection of seven investors. The group includes two married couples and three other individuals, all of whom, in contrast with Ms. Bahramipour, sold at least some of their shares during the class period. *See* IGC January 31 Mem. 1, ECF No. 32; ECF No. 32-2. Their financial interest can be summarized as follows:

| Investor(s) | Number of Shares Purchased | Net Shares Purchased | Net Funds Expended | Losses |
|---|---|---|---|---|
| Victor Blahut | 37,000 | 0 | $282,403 | $282,403 |
| Charles Dewayne Goss and Sherry Phyllis Goss | 19,000 | 13,000 | $211,600 | $166,932 |
| Melissa Culbertson and Timothy Culbertson | 59,000 | 19,500 | $154,080 | $139,561 |
| Duc Tran | 30,000 | 20,000 | $131,943 | $117,050 |
| Yong P. Saito | 35,635 | 0 | $108,360 | $108,360 |
| **TOTAL** | **180,635** | **52,500** | **$848,726** | **$814,306** |

All else being equal, it is plain to see that IGC has a larger financial interest than Ms. Bahramipour. Taken together, its members purchased more shares than she did during the class period, retained more shares when the period ended, spent considerably more than she did, and estimate far more in losses.

8

2.

Ms. Bahramipour does not dispute that IGC "purports to assert larger losses" than she does. Bahramipour January 31 Mem. 1, ECF No. 33. She argues, though, that IGC "is not a qualified movant because it is a purely lawyer-driven artifice cobbled together by three different law[3] firms for the purpose of being appointed lead counsel." *Id.* at 7.

Ms. Bahramipour's argument requires some context. I start, as one would expect, with the PSLRA itself, which expressly provides that the presumptively "most adequate plaintiff" may be a "person or group of persons." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). This language leaves no doubt that Congress "did not intend to preclude multiple plaintiffs in securities class actions from aggregating their losses to satisfy the 'largest financial interest' prong of the PSLRA presumption." *In re E.Spire Commc'ns, Inc. Sec. Litig.*, 231 F.R.D. 207, 212 (D. Md. 2000); *see Goldberger v. PXRE Grp., Ltd.*, No. 06-3410KMK, 2007 WL 980417, at *3 (S.D.N.Y. Mar. 30, 2007) ("There is no dispute that the plain language of the PSLRA permits appointment of a person or group of persons to be lead plaintiff."); *see also China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1808 n.3 (2018) ("District courts often permit aggregation of plaintiffs into plaintiff groups, so even a small shareholder could apply for lead-plaintiff status, hoping to join with other shareholders to create a unit with the largest financial interest.").

That said, it is generally understood that not just any "group of persons" may qualify as the "most adequate plaintiff." Consider, as one district court did, the "*reductio ad absurdum* of a 'group' consisting of the entire class." *Barnet v. Elan Corp.*, 236 F.R.D. 158, 162 (S.D.N.Y.

---

[3] Ms. Bahramipour's January 31, 2019 memorandum in further support of her lead-plaintiff motion alleges that IGC is "apparently represented by a previously undisclosed third law firm, the Bronstein firm." Bahramipour January 31 Mem. 3, ECF No. 33. This assertion appears to be based on a memorandum of law IGC submitted in a securities fraud suit filed last fall against India Globalization in the Eastern District of New York. *See* ECF No. 33-4. That suit was voluntarily dismissed. *See* Bahramipour January 31 Mem. at 10.

2005). There is simply no way Congress could have intended to give the plaintiffs' bar license to herd investors by the dozens – if not hundreds or thousands – in an attempt to run up the total on their aggregated financial interest in the litigation. *See, e.g., McGee v. Am. Oriental Bioeng'ring, Inc.*, 12-5476-SVW-SH, 2012 WL 12895668, at *3 (C.D. Cal. Ot. 16, 2012); *In re E.Spire*, 231 F.R.D. at 213. And yet, if *any* "group of persons," no matter how large or unwieldy, could become the presumptive lead plaintiff, that is exactly what would happen.

Many courts, grappling with the statutory text, have looked to the PSLRA lead-plaintiff appointment procedure's "underlying purpose," observing that "one of Congress's primary concerns in adopting the PSLRA was preventing 'the manipulation by class action lawyers of the clients whom they purportedly represent.'" *Goldberger*, 2007 WL 980417, at *3 (quoting H.R. Conf. Rep. 104-369, at 31, *as reprinted in* 1995 U.S.C.C.A.N. 730, 730). As one district court reasoned, Congress's choice to appoint lead plaintiffs

> on the basis of financial interest, rather than on a 'first come, first serve' basis, was intended to ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers. To allow lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would allow and encourage lawyers to direct the litigation.

*Id.* at *4.

The Third Circuit has observed that the statutory scheme's draftsmanship is, in places, "inartful and hence problematic."[4] *In re Cendant Corp. Litig.*, 264 F.3d 201, 263 (3d Cir. 2001);

---

[4] This characterization was based on the court's observation that there is "some tension" between the two subsections within § 78u-4(a)(3)(B)(iii), which governs the rebuttable presumption and the means of rebutting it. The court was noting, in particular, that one of the Rule 23 requirements, a prerequisite for benefitting from the rebuttable presumption, is that the movant must be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). And yet, the court noted, the statute allows other putative class members to rebut the

*see also In re E.Spire*, 231 F.R.D. at 211 ("Some courts have recognized the inherent tension between the PSLRA's express purpose of preventing lawyer-driven securities litigation and the express language of the statute."). In *In re Cendant Corp. Litigation*, 264 F.3d 201 (3d Cir. 2001), the court took the opportunity to provide some clarity, offering guidance to help lower court judges administer the lead-plaintiff appointment procedure. Its instructions, in my opinion, are persuasive.

In the first place, the Third Circuit rejected contentions "that the statute invariably precludes a group of 'unrelated individuals' from serving as a lead plaintiff." 264 F.3d at 266. The statute, it observed, "contains no requirement mandating that the members of a proper group be 'related' in some manner; it requires only that any such group 'fairly and adequately protect the interests of the class.'" *Id.*

To that end, the court reasoned that the makeup of a group was chiefly relevant to the court's assessment of the group's adequacy under Rule 23. *Id.* at 265-66. The adequacy inquiry raises a multitude of questions. At the outset, the Third Circuit stated, the district court should consider whether the movant "has the ability and incentive to represent the claims of the class vigorously, whether it has obtained adequate counsel, and whether there is a conflict between the movant's claims and those asserted on behalf of the class." *Id.* at 265 (quoting *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988)).

Other questions become relevant when, as here, the movant with the largest financial interest is a group, rather than an individual. In such cases, the Third Circuit stated, the district court should also consider other indicators that the movant would be unable to fulfill its

---

presumption by showing that the presumptively most adequate plaintiff "will not fairly and adequately protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa).

obligations as lead plaintiff. *See id.* at 266. One such indicator, according to the court, might be the size of the group. "At some point," the Third Circuit explained,

> a group becomes too large for its members to operate effectively as a single unit. When that happens, the PSLRA's goal of having an engaged lead plaintiff actively supervise the conduct of the litigation and the actions of class counsel will be impossible to achieve, and the court should conclude that such a movant does not satisfy the adequacy requirement.

*Id.* at 267.

Beyond that, the court stated, the district court may consider whether some other aspect about "the way in which [the] group seeking to become lead plaintiff was formed or the manner in which it is constituted would preclude it from fulfilling the tasks assigned to a lead plaintiff." *Id.* at 266. "If, for example, a court were to determine that the movant 'group' with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on this history, that the members of that 'group' could not be counted on to monitor counsel in a sufficient manner." *Id.* at 267.

3.

This brings me back to the statute. Under the PSLRA, I must presume that the "most adequate plaintiff" is the "person or group of persons" that satisfies each of three requirements. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). As I have already noted, IGC satisfies the first and second requirements – that is, it "made a motion in response" to a PSLRA notice and "has the largest financial interest in the relief sought by the class." *See id.* § 78u-4(a)(3)(B)(iii)(I)(aa), (bb). It is my view that, to the extent that Ms. Bahramipour contests the group's qualifications, her arguments bear on the third requirement: whether IGC "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* § 78u-4(a)(3)(B)(iii)(I)(cc).

Rule 23 establishes the usual requirements for representing a class in class action litigation. *See* Fed. R. Civ. P. 23. Here, where the court's task is to select a lead plaintiff in a securities fraud suit, the relevant portions of Rule 23 are those that aid the court in assessing "whether the movant will be an appropriate class representative." *Ash v. PowerSecure Int'l, Inc.*, No. 4:14-92-D, 2014 WL 5100607, at *3 (E.D.N.C. Oct. 10, 2014). Accordingly, the court "need only determine (1) whether the movant's claims or defenses are typical of the class's claims or defenses, and (2) whether the movant will fairly and adequately protect the interests of the class." *Id.*

Under the Third Circuit's approach, the proper inquiry at this stage is simply whether the movant has made a *prima facie* showing of typicality and adequacy. *See In re Cendant*, 264 F.3d at 263-64. A district court should not consider other putative class members' arguments at this stage; those arguments, according to the court, are more appropriately considered under § 78u-4(a)(3)(B)(iii)(II), when the district court reviews the evidence offered to rebut the presumption. *See id.* at 264. Accordingly, in assessing IGC's entitlement to the presumption, I limit my review to "the pleadings that have been filed, the movant's application, and any other information that the court requires to be submitted." *Id.*

Here, there does not appear to be any question that IGC's claims are typical of the class's claims. The sole question, it seems, is whether IGC will fairly and adequately protect the class's interests.

Certainly, IGC has the same incentive as Ms. Bahramipour or any other putative class member does to vigorously represent the class's claims. There is no conflict between IGC's claims and those asserted on behalf of the class. And, as I will later discuss in some detail, it cannot be claimed that IGC has failed to obtain competent and experienced counsel. *See In re*

*Cendant*, 264 F.3d at 265-665 ("We stress, however, that the question at this stage is not whether the court would 'approve' that movant's choice of counsel . . . ; rather, the question is whether the choices made by the movant with the largest losses are so deficient as to demonstrate that it will not fairly and adequately represent the interests of the class, thus disqualifying it from serving as lead plaintiff at all.").

It is true that IGC comprises seven people – that is, two married couples and three other individuals. Strictly speaking, that is fairly large for a group seeking to serve as lead plaintiff in a securities fraud suit, and it would be entirely appropriate to question whether the members of a group that size could work effectively as one. *See In re Gemstar-TV Guide Int'l, Inc. Sec. Litig.*, 209 F.R.D. 447, 450 (C.D. Cal. 2002). I observe, though, that "there is no 'hard-and-fast rule' regarding the maximum number of parties that can serve as lead plaintiffs in a securities class action." *Sokolow v. LJM Funds Mgmt., Ltd.*, No. 18-cv-01039, 2018 WL 3141814 (N.D. Ill. June 26, 2018) (quoting *In re Cendent*, 264 F.3d at 267). And other courts have granted lead plaintiff status to groups of seven or thereabouts. *See, e.g., Sokolow*, 2018 WL 3141814, at *4 (approving a seven-member group); *Weltz v. Lee*, 199 F.R.D. 129, 133 (S.D.N.Y. 2001) (concluding that a group of seven members was not "so cumbersome as to deliver the control of the litigation into the hands of the lawyers"); *In re Advanced Tissue Sci. Sec. Litig.*, 184 F.R.D. 346, 352-53 (S.D. Cal. 1998) (approving a six-member group); *Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 409 (D. Minn. 1998) (approving a six-member group).

Here, I find it relevant to note that the group includes two married couples, who presumably have some experience making decisions as a unit. *See Nakamura v. BRF S.A.*, No. 18-2213, 2018 WL 3217412, at *3 (S.D.N.Y 2018) (affording "some weight" to brothers' familial relationship "and the likelihood that they will act in unison"). I also observe that the

individual members' relative stakes in the litigation are both significant and fairly comparable, a fact I view as an indicator that these investors "can be counted on to monitor counsel in a sufficient manner." *Sokolow*, 2018 WL 3141814, at *4.

IGC members' also have submitted a joint declaration attesting that they were "aware of each other" before they filed their motion, that they jointly approved their selection of counsel, and that they are "aware of the responsibilities and duties of being" lead plaintiff. IGC Joint Decl. ¶ 9, ECF No. 32-4. It further states that they "had a group email list and contact information for each other and counsel and a toll-free conference call number for communications relating to the case," and that they had "variously communicated with selected counsel about [the] lead plaintiff motion, the functioning and communication of [their] proposed group, case strategies, and the next steps in the case." *Id.*

The members, according to the declaration, have since continued to communicate with each other and counsel via email and conference call, discussing, among other things, the strength of their case and litigation strategy. *See id.* ¶ 12. While they say they "do not anticipate any disagreements," they have agreed that any disputes, should they arise, will be resolved by a majority vote, with each member of the group wielding one vote. *Id.* ¶ 11.

The declaration signals to me that IGC's members are prepared to play an active role in this litigation and to monitor the actions of their selected counsel. *See Klugmann v. Am. Capital Ltd.*, No. PJM 09-5, 2009 WL 2499521, at *5 (D. Md. 2009) (approving a three-member group after noting that each member had submitted a "detailed declaration" attesting to their belief that they could act as a cohesive group and discussing the ways they intend to communicate about the litigation). Having reviewed their motion and related materials, I am satisfied that IGC has made the necessary *prima facie* showing of adequacy under Rule 23 and 15 U.S.C. § 78u-

4(a)(3)(B)(iii)(I)(cc). *See In re Cendant*, 264 F.3d at 263 ("This initial inquiry (i.e., the determination of whether the movant with the largest interest in the case 'otherwise satisfies' Rule 23) should be confined to determining whether the movant has made a *prima facie* showing of typicality and adequacy."). It follows, therefore, that IGC is entitled to a rebuttable presumption that it is the "most adequate plaintiff" under the PSLRA lead-plaintiff appointment framework. *See* § 78u-4(a)(3)(B)(iii)(I).

4.

Under the PSLRA, the presumption that a movant is the most adequate plaintiff "may be rebutted only upon proof by a member of the purported class that the presumptively most adequate plaintiff (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

"[O]nce the presumption is triggered, the question *is not* whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a "fair and adequate' job." *In re Cendant*, 264 F.3d at 268.

Ms. Bahramipour has not met her burden of proof on this point. Her contention, in brief, is that IGC's members appear not to have known each other before this lawsuit commenced. *See* Bahramipour January 31 Mem. 3. As I have explained, though, the extent of the members' prior relationships, whatever they may be, is simply one of several factors bearing on whether a group can "fairly and adequately protect the interests of the class." *See id.* at 266-67. The statute does not "invariably preclude[] a group of 'unrelated individuals' from serving as a lead plaintiff." *Id.* at 266; *see Klugmann*, 2009 WL 2499521, at *4-5 (rejecting an argument that a group's

16

members should not be permitted to aggregate their losses because they had no prior relationship with each other).

Ms. Bahramipour also argues that the IGC members are too numerous to work together effectively. *See* Bahramipour January 31 Mem. 3. The members, though, have attested that they were in communication before they filed their motion, have remained in communication since, and have put in place a voting process to resolve any disagreements that might arise. *See* IGC Joint Decl. ¶¶ 9-12.

My task, in appointing a lead plaintiff, is not to compare and contrast the relative merits of the two movants. *See In re Cendant*, 264 F.3d at 268. Congress has prescribed a process, and it is my assessment that, under that process, IGC is entitled to a rebuttable presumption in favor of its appointment. Absent some "*proof*" that IGC cannot fulfill its responsibilities, the presumption must stand. *See* § 78u-4(a)(3)(B)(iii)(II) (emphasis added). That proof is lacking here. I am therefore appointing IGC as lead plaintiff in this case.

### Lead Counsel

The PSLRA entitles the "most adequate plaintiff" to select and retain class counsel "subject to the approval of the court." 15 U.S.C. § 78u-4(a)(3)(B)(v). "The court has an obligation to assure that Lead Plaintiff's choice of representation best suits the needs of the class." *Johnson v. Pozen Inc.*, No. 1:07CV599, 2008 WL 474334, at *3 (M.D.N.C. Feb. 15, 2008). Whether the court accepts the lead plaintiff's choice of counsel is a matter of discretion. *See id.*

IGC seeks to bring on two firms as co-lead counsel: Pomerantz LLP and the Rosen Law Firm, P.A. *See* IGC Mot. 2, ECF No. 21. The group also asks to appoint Cohen Milstein Sellers & Toll PLLC as liaison counsel for the class. *See id.*

There is no dispute that these firms have considerable experience with securities class actions such as this one. To the extent that there are objections to the group's selection, it is the concern that "the appointment of multiple firms as co-lead counsel [may be] likely to create duplicative attorney work resulting in higher legal fees and expenses for the class, and, consequently, a lower recovery for the class." Bahramipour January 31 Mem. 3.

Courts have often allowed co-counsel to represent the plaintiff class in a securities fraud action. *See China Agritech*, 138 S. Ct. at 1808 n.3 (citing a law review article for the statistic that 80 percent of securities class actions in a post-PSLRA data sample had two or more co-lead counsel firms); *see, e.g., Rice v. Genworth Fin. Inc.*, No. 3:17CV59, 2017 WL 3699859, at *13 (E.D. Va. Aug. 25, 2017); *In re Mun. Mortg. & Equity, LLC Sec. & Derivative Litig.*, No. MDL 08-MD-1961, 2008 WL 11363375, at *5-6 (D. Md. Aug. 27, 2008); *Johnson*, 2008 WL 474334, at *3; *In re USEC Sec. Litig.*, 168 F. Supp. 2d 560, 568-69 (D. Md. 2001). I will allow it here, as well. I observe, though, that in approving two or more firms to represent the class, courts have tended to admonish counsel "that any future application for legal fees must show that there is no overlap of legal work and that counsel have efficiently allocated responsibilities so as to confine attorneys' fees to those that are reasonable in amount and necessarily incurred." *Rice*, 2017 WL 3699859, at *13; *see In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 50 (S.D.N.Y. 1998). Counsel in this case should consider themselves so advised.[5]

## CONCLUSION

IGC has demonstrated its entitlement to serve as lead plaintiff under the PSLRA appointment procedure. This suit will proceed with IGC as lead plaintiff. Pomerantz LLP and

---

[5] To assist me (when and if the time comes) in reviewing motions for approval of attorneys' fees, lead counsel will organize their billing records in accordance with para 1.b. Appendix B, U.S. District Court for Maryland Local Rules (December 1, 2018).

the Rosen Law Firm, P.A. will serve as lead counsel for the class, with Cohen Milstein Sellers & Toll PLLC serving as liaison counsel.

A separate Order follows.

Date: February 28, 2019

/s/ Paul W. Grimm
Paul W. Grimm
United States District Judge