Steven J. Toll (Md. Bar No. 15824)
Daniel S. Sommers (Md. Bar No. 15822)
S. Douglas Bunch
**COHEN MILSTEIN SELLERS &**
   **TOLL PLLC**
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699
Email: stoll@cohenmilstein.com
       dsommers@cohenmilstein.com
       dbunch@cohenmilstein.com

*Liaison Counsel for Lead Plaintiff*
*additional counsel on signature page*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Southern Division)

| | |
|---|---|
| **ALDE-BINET TCHATCHOU,** Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> **INDIA GLOBALIZATION CAPITAL, INC.,** et al., <br><br> Defendants. | No. 8:18-cv-03396-PWG <br><br> **CLASS ACTION** <br><br> Judge Paul W. Grimm <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## CONSOLIDATED AMENDED COMPLAINT FOR
## <u>VIOLATION OF FEDERAL SECURITIES LAWS</u>

Lead Plaintiff IGC Investor Group (consisting of Lead Plaintiff members Victor Blahut, Charles Dewayne Goss, Sherry Phyllis Goss, Melissa Culbertson, Timothy Culbertson, Duc Tran, and  Yong P. Saito) ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's consolidated amended complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding India Globalization Capital, Inc. ("IGC" or the "Company"), analysts' reports and advisories about the Company, documents obtained in consultation with experts, and information readily obtainable on the Internet.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired IGC common stock between September 26, 2018 and October 26, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against IGC and certain of its top officials.

2.     IGC has been described as a "cannabis company that doesn't sell cannabis." Its primary source of revenue is from its legacy business of trading commodities and heavy equipment rental.

3.     In September 2018, IGC decided to jump on the then-hot marijuana stock

1

bandwagon with the announcement that it would produce a cannabidiol ("CBD") infused beverage called "Nitro G," and claimed to have entered into a distribution agreement with a Malaysia-based manufacturing partner.

4.     IGC then timed a secondary stock offering to commence on the same day it announced its foray into Nitro G.

5.     Unbeknownst to investors, what IGC touted as its "experience[d]" "manufacturer" in Malaysia was a recently-created distributor entity – not a manufacturer – over which Defendants were able to exercise substantial control through a key insider appointment.

6.     Even more seriously, Defendants failed to tell investors that marijuana, or any other form of cannabis product, including CBD oil, is illegal in Malaysia; indeed, the manufacture and possession of such items is punishable by death.

7.     The Nitro G announcement helped kick off a near six-fold rise — the stock ran up 458% — over the next five sessions, while the secondary offering raised $30 million in much-needed capital for the Company.

8.     Aside from rewarding IGC by increasing its market capitalization, the Individual Defendants rewarded themselves: five of the seven largest holders of IGC stock during the Class Period were IGC executive officers and directors.

9.     IGC's downfall, however, came as quickly as its ascendance: on October 2, 2018 Citron Research cautioned investors that IGC was "[n]o product. All hype." Shares fell more than 30%.

10.    On October 4, 2018, a report, published on the financial news website *MarketWatch*, disclosed the blatant impossibility and illegality of Nitro G, the product Defendants had just touted to raise $30 million.  IGC's stock price dropped by more than 36%.

11.     Finally, on October 29, 2018, the NYSE American announced "that the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of India Globalization Capital, Inc." from the Exchange, effective immediately.  The NYSE American explained its decision by pointing out that IGC "**ha[d] become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical**" – an obvious reference to Nitro G – and further charged that the "Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest." The delisting caused a 77.5% decline in IGC shares, devastating investors.

12.     The chart below illustrates the rapid rise and fall of IGC during the Class Period:





13.     Upon the disclosure, or the materialization of the risk, of Defendants' wrongful acts and/or omissions that caused the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as IGC's principal executive offices are located within this Judicial District.

17.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

18.     The members of Lead Plaintiff IGC Investor Group acquired IGC common stock at artificially inflated prices during the Class Period and were damaged upon the revelation of the disclosures and/or materialization of concealed risks alleged herein.

19.     Defendant IGC is incorporated in Maryland, with principal executive offices located at 4336 Montgomery Avenue, Bethesda, Maryland.  Throughout the Class Period, IGC's common stock was actively traded in an efficient market on the NYSE American exchange ("NYSE American") under the symbol "IGC."

20.     Defendant Ram Mukunda ("Mukunda") has served as IGC's Executive Chairman, Chief Executive Officer, and President since April 2005.

21.     Defendant Claudia Grimaldi ("Grimaldi") has served as the Company's "Principal Financial Officer" since May 2018.

22.     The Defendants referenced above in ¶¶20-21 are sometimes referred to herein collectively as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of IGC SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were therefore materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

### IGC's History of Business "Pivots"

24.     IGC was organized in Maryland in 2005 as a "blank check company" with the stated purpose of acquiring one or more businesses, primarily in India.

25.     A blank check company is a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person.

26.     Just before the start of the Class Period, IGC represented that it had two business

segments: legacy infrastructure and medical cannabis-based alternative therapies. The so-called "legacy business" consists of a) trading of infrastructure commodities like steel and iron ore, among others; and b) rental of heavy equipment.

27.     However, in the almost fourteen years between IGC's inception and the beginning of the Class Period, the Company dabbled in a string of disparate business lines while failing to develop any particular area of competency.

28.     On March 8, 2006, IGC completed its initial public offering.

29.     In 2008, IGC purchased Indian subsidiaries Sricon and Techni Bharathi Limited, both of which were in the engineering and construction industry.

30.     In February 2009, IGC purchased IGC-IMT, which was formed just two months earlier, to engage in the business of trading and mining.

31.     In 2014, IGC: (i) acquired a controlling stake in Golden Gate Electronics Limited; (ii) entered into an agreement with TerraSphere Systems LLC to produce indoor farming facilities for growing leafy vegetables; and (iii) purchased a 24.9% stake in Midtown Partners & Co., LLC, a firm registered as a broker-dealer.

32.     In 2016, IGC acquired Cabaran Ultima Sdn. Bhd. ("Cabaran Ultima"), a Malaysia-based "international project development company" with claimed expertise in "building infrastructure to support growing and extraction of medical grade oils from plants," and "managing the construction of high-end luxury complexes." Following the acquisition, IGC claimed to be "operat[ing] a real estate management business" in Malaysia.

33.     By September 2017, IGC claimed to be "racing ahead with its preparation of medical trials for four drug candidates that treat a variety of debilitating conditions," though, in fact, IGC assigned minimal funding to research and development –approximately $114,000 and

$137,000 in fiscal years 2017 and 2018, by IGC's own admission – and none to clinical studies or any of the other steps needed to win U.S. Food and Drug Administration ("FDA") approval for its putative drug candidates.

34.     Unsurprisingly, given the paucity of its research expenditures, IGC had, by early 2019, succeeded only at making Hyalolex – a "non-FDA approved product" – "available for purchase in select dispensaries in San Juan, Puerto Rico."

35.     At the time it filed its annual report with the SEC on June 21, 2018, IGC stated that its "main focus [wa]s to develop and commercialize cannabinoid based alternative therapies for indications such as Alzheimer's disease, Parkinson's disease, and pain" and that "[i]ts lead product [wa]s Hyalolex, an alternative oral therapy for the treatment of symptoms associated with Alzheimer's disease."

**IGC Faces Financial Pressure and Regulatory Consequences**

36.     In its last quarterly filing with the SEC prior to the start of the Class Period, IGC posted a loss of $512,296 on revenue of $1.5 million for the three months ended June 30, 2018.

37.     In addition, IGC faced debt repayment difficulties both before and during the Class Period.  In 2009, IGC took a $1.8 million loan from Bricoleur Capital Management ("Bricoleur"), an investment advisor, which it proceeded to pay back with stock shares.  From 2009 to March 31, 2018, IGC paid shares for renewals, and as a "penalty," for every month that the loan was outstanding.

38.     At the start of the Class Period, IGC's financial position necessitated a capital raise: according to IGC's most recent annual report, out of assets valued at $10.853 million, only $1.658  million consisted of cash and cash equivalents:

| ASSETS | | March 31, 2018 | | March 31, 2017 |
|---|---|---|---|---|
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 1,658,496 | $ | 538,029 |
| Accounts receivable, net of allowances | | 557,813 | | 752,926 |
| Inventories | | 486,497 | | - |
| Investments held for sale | | 147,500 | | - |
| Other current assets | | 354,641 | | 410,408 |
| Short -term investments | | - | | 1,880,000 |
| **Total current assets** | $ | 3,204,947 | $ | 3,581,363 |
| **Long-term assets:** | | | | |
| Goodwill | | - | | 198,169 |
| Intangible Assets | | 127,826 | | - |
| Property, plant and equipment, net | | 6,236,839 | | 953,936 |
| Investments | | 798,922 | | 6,011,114 |
| Other non-current assets | | 484,562 | | 539,720 |
| **Total long-term assets** | $ | 7,648,149 | $ | 7,702,939 |
| **Total assets** | $ | 10,853,096 | $ | 11,284,302 |

39.     An analyst report issued by SADIF-Investment Analytics on September 7, 2018, prior to the start of the Class Period, described IGC as "in need of a cure."

**IGC Cashes in on Market Trends**

40.     In recent years, IGC has demonstrated a clear pattern of repeatedly entering the latest hot market in the hopes of boosting its stock price.

41.     In December 2017, less than a week after Long Island Iced Tea Corp. sent its stock up 183% by announcing it was changing its name to Long Blockchain Corp., IGC claimed that it would leverage its existing team of technology and healthcare experts to develop methods utilizing blockchain in areas such as product identification assurance (or "PIA").

42.     As a result, IGC's stock shot up 91% to $1.26 on December 26, 2017, the first closing price above the $1 mark since July 2014.

43.     However, as of the Company's most recent quarterly filing in February 2019, the Company had yet to deploy the PIA system it touted to the market more than a year earlier.

44.     During September 2018, market watchers began to speak of a "green rush," based on the observation that "marijuana stocks are soaring once again."[1]

45.     In mid-September 2018, Level Brands Inc.'s stock more than doubled in

---

[1] *See* https://medium.com/datadriveninvestor/how-to-survive-the-marijuana-stock-green-rush-of-2018-what-to-look-for-and-what-to-avoid-e6ae9ee584a5

connection with the company's announcement, on September 21, 2018, that it would launch five new CBD products.

46.     Just four days later, on September 25, 2018, IGC made its own announcement that it was entering "the Hemp/CBD-infused energy drink space" and would begin producing a sugar-free cannabis drink called "Nitro G." In the announcement, IGC claimed that (i) it had entered into a distribution agreement giving it the right to market Nitro G in, among other places, the U.S.; and (ii) Nitro G would be manufactured in Malaysia.

47.     In response to IGC's announcement, the Company's stock began rising precipitously.  A few days later, on October 2, IGC's stock price hit a high of $14.58 on volume of 19 million shares. That price was over six times higher – the stock ran up *458%* – than just one week earlier.

48.     In order to take advantage of the rise in its share price, IGC commenced an "at-the-market" (or "ATM") stock offering on September 25, the same day it announced it was entering the CBD drink market.

49.     An ATM offering is a type of secondary offering of stock utilized by publicly traded companies in order to raise capital over time.  In an ATM offering, exchange-listed companies incrementally sell newly-issued shares into the secondary trading market through a designated broker-dealer at prevailing market prices.  Accordingly, a higher stock price means a greater amount of money can be raised.

50.     Through the ATM offering, which closed on October 2, 2018, IGC was able to raise $30 million of capital at a price of $5.30 per share to take advantage of its skyrocketing share price in late September, as depicted in the following chart:



[Source: *MarketWatch*]

51.     As a direct result of its ATM offering, IGC reported $27 million in cash in its February 12, 2019 quarterly report, with a book value of about $0.92 per share.

52.     One market observer, writing in the investor blog *Seeking Alpha*, noted that "[t]he capital raise was significant given the company's size and, if maintaining the recent burn rate, could potentially fund IGC's losses for years.  Together, the book value and the cash position could provide support for the stock price."[2]

53.     With respect to the Company's Nitro G announcement, IGC's executive officers were the largest beneficiaries of the boost in its stock price.

54.     As the following chart demonstrates, during the third quarter of 2018, when the fraudulent practices complained of herein occurred, five of the top seven shareholders –

---

[2] *See* https://seekingalpha.com/article/4250202-india-globalizations-relisting-may-stamp-approval?page=2

Mukunda, Shenoy, Grimaldi, Prins, and Goel – were IGC executive officers and directors.



**IGC Was Legally Barred from Manufacturing Nitro G in Malaysia**

55.     In the September 25, 2018 press release announcing its alleged entry into the CBD market, IGC indicated it would partner with a manufacturer in Malaysia.

56.     However, manufacturing CBD-based beverages was – and remains – illegal under Malaysia's drug laws, a fact that Defendants failed to disclose during the Class Period, and which was only revealed to investors upon publication of the *MarketWatch* report.

57.     Plaintiff has retained Dr. Abdul Rani Bin Kamarudin, a professor in the Legal Practice Department at the International Islamic University Malaysia, to provide background on the legal status of CBD-derived products under Malaysia's drug laws.  Dr. Kamarudin is the author of "The Misuse of Drugs in Malaysia: Past and Present" (2007), a comprehensive overview of the history of drug use and regulation in Malaysia from the 19th to 21st centuries.

*See* https://www.adk.gov.my/wp-content/uploads/1-1.pdf.

58.     Plaintiff has also retained Fifa Rahman.   Ms. Rahman developed expertise in Malaysian drug policy as Policy Manager at the Malaysian AIDS Council in Kuala Lumpur, Malaysia between January 2013 and December 2016.   In 2013, Ms. Rahman published a book entitled *Drug Law Reform in East and Southeast Asia* with co-editor Nick Crofts.

59.     In Malaysia, cannabis is a prohibited or controlled substance governed by several relevant laws, discussed below.   With few exceptions, such as authorized medical and/or scientific persons or bodies (doctors, veterinarians, dentists, pharmacists, hospitals, researchers, or licensed/permit holders), the manufacture, possession, sale, or use of cannabis-based products is unlawful.

60.     For purposes of Malaysia's Dangerous Drugs Act 1952 ("DDA 1952"), CBD is considered to be cannabis, a "dangerous drug" under Section 2 and the First Schedule of the DDA 1952 (Act 234).

61.     CBD, being a form of cannabis, is prohibited for importing, exporting, manufacturing, possession, selling or consumption (personal or otherwise).   For that matter, the use of or the management of any land/premises by any person (owner or occupier) for such purpose, directly or indirectly, is prohibited.

62.     Manufacturing beverages containing CBD violates the DDA 1952 and would, therefore, be presumptively illegal.

63.     In August 2018, Muhammad Lukman Bin Mohammad ("Lukman") was sentenced to death by hanging in Malaysia pursuant to the DDA 1952 for processing and distributing marijuana in liquid form.   Lukman sold cannabis oil to help patients suffering from illnesses such as cancer and leukemia.

64.      According to Section 21 of Poisons Act 1952 (the "Poisons Act") (Laws of Malaysia Act 366), Section 21, read in conjunction with Section 20 of the same Act, cannabis (including CBD) cannot, as a "Group B Poison," be sold or supplied by wholesale or resale except by a licensed wholesaler to a licensed pharmacist or to another licensed wholesaler, or by a licensed wholesaler to be immediately exported to a purchaser outside Malaysia.  Licenses would be obtained under Section 26 of the Poisons Act, which states:

Section 26. Licences.

(1) The Director General of Health, or the Director of Pharmaceutical Services or the Director of Medical and Health Services of any State duly appointed in writing by the Director General of Health to be a Licensing Officer of any State or the Federal Territory may, subject to this Act, issue licences for the purposes of this Act.

(2) Such licences may be-

(a) a Type A licence issued to a pharmacist to import, store and deal generally by wholesale and retail or by wholesale only or by retail only, subject to this Act, in all poisons;

(b) a Type B licence issued to any person whom the Licensing Officer may consider to be a fit and proper person to hold such licence, or issued to a responsible officer of a company incorporated under the Companies Act 1965[Act 125] to import, store and sell by wholesale such poisons (not being a Group A Poison) as may be specified in such licence:

Provided that no such licence shall be issued to any person or officer who is engaged or *concerned in any business of selling goods by retail* or shall continue valid at any time after such person or officer becomes so engaged or concerned[.]

65.      Manufacturing an energy drink product for retail or commercial purposes with CBD, as IGC touted with its proposed Nitro G, would not qualify under this provision of the Poisons Act to obtain a license. Moreover, IGC's alleged Malaysian partner in the Nitro G venture, Treasure Network SDN.BHD. ("Treasure Network"), lists its "nature of business" as "general trading" in its Certificate of Incorporation under the Malaysian Companies Act 2016, which further disqualifies it from obtaining a license under the Poisons Act to deal in cannabis.

66.     CBD, if proposed for commercial use, would also be subject to the Control of Drugs and Cosmetics Regulations 1984 ("CDCR 1984"), providing that no person shall manufacture, sell, supply, import, possess or administer any product unless the product is registered under a license issued by the Director of Pharmaceutical Services.

67.     CBD in beverages would fall squarely under the purview of Malaysia's National Pharmaceutical Regulatory Agency ("NPRA"), which is tasked with regulating products within the food-drug interphase ("FDI") containing ingredients included in the "Negative List for FDI." Negative List for FDI item No.11 is "Cannabis Spp. (all species) i.e. Marijuana, Hemp."

68.     The NPRA maintains a list of licensed manufacturers on its webpage, and neither IGC nor Treasure Network appear on that list; for that matter, neither does Treasure Sugar, which manufactures the products that Treasure Network merely distributes, *see* ¶74, *infra*.  The absence of all these entities from the NPRA list indicates that they are not licensed manufacturers under Malaysian law and that CBD-infused Nitro G is not an approved or registered product under Malaysian law.[3]

69.     Indeed, Malaysia's Health Ministry did not even begin to *consider* the limited liberalization of the country's cannabis laws for medical – not commercial – purposes until December 2018, after the end of the Class Period.[4]

70.     Malaysia's Health Minister revealed, on February 12, 2019, that no companies had registered with the Health Ministry to use cannabis-based products for medical purposes, which, as explained above, is the only possible legal use of such products.[5]

_____

[3] *See* https://www.npra.gov.my/index.php/en/informationen/quest-list-of-manufacturers-wholesalers-importers/quest-list-of-manufacturers.html

[4] *See* https://www.malaymail.com/news/malaysia/2018/12/26/health-ministry-wants-documented-evidence-of-medical-marijuana-benefits-fir/1706394

[5] *See* https://www.malaymail.com/news/malaysia/2019/02/12/deputy-minister-no-companies-

**Treasure Network Was a Recent Creation Over Which IGC Exercised Control**

71.     IGC did not name the Malaysian company it was to partner with in its September 25, 2018 press release.  The investor site *Proactive Investors* reported on October 2 that it had made multiple requests to IGC for comment on the matter, but that IGC refused to respond.[6]

72.     It was not until after the Class Period, in February 2019, that IGC revealed that its Malaysian "manufacturer" for Nitro G was Treasure Network.

73.     Treasure Network was incorporated in Kuala Lumpur on April 7, 2017, less than eighteen months prior to IGC's announcement regarding Nitro G, and did not register its business website domain until October 5, 2018, ten days *after* the Nitro G announcement.

74.     Treasure Network is not a manufacturer, but rather a distributor for Treasure Sugar, a food and beverage company that manufactures its products in Malaysia.

75.     Currently, Treasure Network distributes a non-CBD version of Nitro G.[7]

76.     On September 24, 2018, the day before the Nitro G announcement, Chua Seong Seng ("Seng") was appointed as one of four Directors of Treasure Network.  Prior to IGC's Cabaran Ultima acquisition, Seng was Cabaran Ultima's Managing Director.  Following the acquisition, he became a "Senior Advisor" at IGC, a position he continues to hold.[8]  Seng also holds a 25% stake in Treasure Network.

77.     Accordingly, Defendants had the ability to exercise control over Treasure Network was at all relevant times, which helps explain their failure to disclose its identity to investors at the time of the Nitro G announcement.

---

have-registered-to-use-cannabis-based-products/1722395

[6] *See* https://www.proactiveinvestors.com/companies/news/206225/short-seller-andrew-lefts-citron-research-sets-sights-on-india-globalization-capital-206225.html

[7] *See* http://treasurenetworkglobal.com/our-products/nitrog10/

[8] *See* https://igcpharma.com/chua-seong-seng/

**Materially False and Misleading Statements Issued During the Class Period**

78.     On September 25, 2018, the Company issued a press release entitled, "IGC to

Enter the Hemp/CBD-Infused Energy Drink Space," where it announced the Nitro G venture and

stated, in relevant part:

> India Globalization Capital, Inc. (NYSE AMERICAN: IGC) announces today
> that it has executed a distribution and partnership agreement for several products
> including a sugar free, energy drink called 'Nitro G'.
>
> IGC will pay 797,000 shares of restricted, unregistered, common stock, for a 10-
> year agreement, with an option for multiple 5-year extensions, *for the rights to
> market the products in the U.S., Canada, Mexico and South America* and
> exclusive global rights to all developed CBD-infused products.
>
> IGC plans to create a branded, hemp/CBD-infused version of the formulation
> that addresses market demand for energy drinks with the inclusion of healthy
> properties derived from hemp including CBD.
>
> "According to a Grand View Research forecast, the global energy drinks market
> is projected to be almost $85 billion by the year 2025, with non-alcoholic
> beverage sales expected to account for a significant portion of the market. This
> represents a unique opportunity for the development and commercialization of a
> CBD-infused, sugar free energy beverage," stated Ram Mukunda, CEO of IGC.
>
> *"By combining the experience of IGC with Hyalolex with the manufacturer in
> Malaysia, we potentially bring together unique expertise in
> microencapsulation, solubility, infusion, controlled dose delivery, and sugar
> free processes, among others.* This will help introduce an exciting CBD-infused
> energy drink to the market and the acquired knowledge base can be further
> leveraged to diversify the delivery method for IGC branded products including
> Hyalolex, our flagship product for patients suffering from Alzheimer's,"
> continued Mukunda.
>
> *This transaction is particularly timely given the language of the 2018 Farm
> Bill that currently addresses potentially legalizing, on a federal level, industrial
> hemp and products derived from it, including hemp oil that contains CBD*.
> [Emphasis added.]

79.     On this news, the Company's stock skyrocketed from $2.33 per share on

September 25, 2018, to $13.00 on October 2, 2018.

80.     The statements referenced in ¶78 were materially false and misleading because

Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) cannabis-based products, including CBD-based beverages, are illegal in Malaysia; (ii) neither IGC nor Treasure Network was a licensed manufacturer of cannabis-based products in Malaysia; (iii) CBD-infused Nitro G was not an approved and registered product under Malaysian law; (iv) Treasure Network, founded in 2017, was not "experienced"; (v) Treasure Network was a distributor, not a manufacturer; (vi) at all relevant times, Defendants had the ability to exercise substantial control over Treasure Network; and (vii) as a result, IGC's public statements were materially false and misleading at all relevant times.

81.     On October 6, 2018, in an attempt to rebut the exposure of its illegal CBD-drink gambit, IGC posted on Twitter that "[o]ur growth and expansion strategies are to commercialize and license our products in states and countries where we can legally enter the market."

82.     On October 16, 2018, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q3 2018 10-Q").  The Q3 2018 10-Q was signed by the Individual Defendants and referred back to the September 25, 2018 press release, stating, in relevant part:

> On October 4, 2018, we filed a provisional method and composition patent application (IGC-509) with the U.S. Patent and Trademark Office (USPTO) for the treatment of fatigue and energy restoration. ***This patent filing is one of a series of steps in the Company's development and commercialization plan to support the creation of a branded, hemp/CBD sugar-free energy drink, which was previously disclosed by the Company on September 25, 2018***.  [Emphasis added.]

83.     The Q3 2018 10-Q further stated that "[t]he Company recently entered the hemp oil / cannabidiol (CBD) infused beverage space and expects to bring a sugar free CBD infused energy drink to market."

84.     The statements referenced in ¶¶81-83 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) cannabis-based products, including CBD-based beverages, are illegal in Malaysia, where IGC previously stated Nitro G would be manufactured; (ii) neither IGC nor Treasure Network was a licensed manufacturer of cannabis-based products in Malaysia; (iii) CBD-infused Nitro G was not an approved and registered product under Malaysian law; (iv) consequently, Defendants had not "entered the hemp oil / cannabidiol (CBD) infused beverage space" in any meaningful sense; (v) Defendants' "development and commercialization plan to support the creation of a branded, hemp/CBD sugar-free energy drink" was completely illusory; and (vi) as a result, IGC's public statements were materially false and misleading at all relevant times.

**<u>The Truth Slowly Emerges</u>**

85.     On October 2, 2018, Citron Research ("Citron"), a stock commentary website, labeled IGC "the poster child of a cannabis bubble" in a Twitter post.  Citron cautioned investors about the Company, stating that it was "***[n]o product.  All hype***":



86.    In a second tweet issued just minutes later, Citron posted a $6 target price on the stock, implying a 54% downside on the price IGC closed at later that day ($12.89).   Citron added, "IGC has raised money 3 times in 3 weeks at an average price of $3.31."

87.    By midday on October 2, the Citron tweets were being reported on the financial blog *Seeking Alpha*.

88.    Following the Citron tweets, market observers began to scrutinize the Company, uploading photos of the address listed on IGC's June 21, 2018 annual report.   Google Street View images  from  September  2017 showed a  small  suburban  home  also  known  as  "Arbol House," a child care center that Google lists as permanently closed:



89.     Between October 2 and 3, 2018, on the partial revelation discussed above, IGC's share price fell $4.15, or 30.77%, to close at $8.85 on October 3, 2018.

90.     On October 4, 2018, *MarketWatch* published a report that promised to reveal "[a]ll the potential red flags for investors in IGC, the pot stock that jumped 1,000% in three months." In particular, the article discussed an "alarming number of red flags" it uncovered which "undermine[d]" claims made by the Company.[9]

91.     Among other things, the *MarketWatch* report showed that the Company had issues with the SEC, had problems pivoting to different businesses over the years, that insiders, including the Individual Defendants, usually profited the most from movements in the stock price, and that IGC's chief scientific officer had previously been charged with falsifying data.

92.     By far the most critical revelation in the *MarketWatch* report was that IGC's proposal to manufacture Nitro G in Malaysia – the basis for its astronomical stock price rise and ATM offering that netted $30 million for the Company just days earlier – was flatly illegal: "[i]n the release announcing the plan for CBD-infused drinks, IGC indicates it will work with a manufacturer in Malaysia, but *that country has a mandatory death sentence for cannabis possession and has no medical-marijuana program*." (Emphasis added).

93.     The article quoted Erny Sabrina Mohd Noor, counselor for agriculture at the Malaysian Embassy in Washington, D.C., who stated that "*Marijuana or any form of products including CBD oil is illegal in Malaysia*," (emphasis added).

94.     *MarketWatch* further reported that it had:

---

[9]*See* Ciara Linnane, Francine McKenna, & Tomi Kilgore, "All the potential red flags for investors in IGC, the pot stock that jumped 1,000% in three months." *MarketWatch* (orig. published Oct. 4, 2018, updated Nov. 23, 2018), publicly-available at: https://www.marketwatch.com/story/10-potential-red-flags-for-investors-in-india-globalization-capital-the-pot-stock-that-jumped-1000-in-three-months-2018-10-04

…. spent several days calling and emailing IGC, its executives and the scientists whom it names as advisers on its website. Founder and Chief Executive Ram Mukunda returned a call on Wednesday, before asking for time to read the questions we had emailed him with the promise he would call back. On Thursday, the company said it would provide answers to our questions. It has not done so at this time.

95.    Following the publication of the *MarketWatch* report, IGC's stock price fell from $6.41 per share on October 4, 2018 to $4.05 per share on October 5, 2018 – a $2.36, or 36.72%, drop.

96.    IGC did not issue a response to – or denial of – the explosive claims made in the *MarketWatch* report.  Instead, on October 5 and 6, 2018, two apparent attempts to dispel "red flags" cited in the *MarketWatch* report were posted on IGC's Twitter account.

97.    The first, on October 5, was directed at the *MarketWatch* report's inclusion of a photo of the dilapidated home/child care facility listed in the Company's SEC filings as its headquarters:  "[o]perationally, our U.S. East Coast based staff works from our corporate office in Potomac, Maryland or nearby virtual offices. We also maintain offices in the State of Washington for our West Coast based staff. - Excerpt from Form 424B5 filing on 10/2/18."

98.    The second, on October 6, falsely contested the illegality of IGC's Nitro G announcement:



99.     The statements referenced in ¶98 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) cannabis-based products, including CBD-based beverages, are illegal in Malaysia; (ii) neither IGC nor Treasure Network was a licensed manufacturer of cannabis-based products in Malaysia; (iii) CBD-infused Nitro G was not an approved and registered product in Malaysia; and (iv) as a result, IGC's public statements were materially false and misleading at all relevant times.

100.    With IGC subject to increasing scrutiny in the wake of the *MarketWatch* report, the NYSE American, on October 29, 2018, announced, in relevant part, and in clear reference to Nitro G:

> NEW YORK, October 29, 2018 – NYSE American LLC ("NYSE American" or the "Exchange") announced today that the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of India Globalization Capital, Inc. (the "Company") — ticker symbol IGC —from the Exchange.  Trading in the Company's common stock on the NYSE American will be suspended immediately.
>
> NYSE Regulation commenced delisting proceedings against the Company pursuant to Section 1003(c) (i) of the NYSE American Company Guide (the "Company Guide") which states that where *the issuer has substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical*, it shall not be considered an operating company for the purposes of continued trading and listing on the Exchange.
>
> *NYSE Regulation also considered Section 1003(f) (iii) because the Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest.* Section 1009(a) (ii) of the Company Guide states that it is necessary and appropriate for the protection of investors to immediately suspend trading in the Company's common stock.

101.    Following this news, IGC common stock ceased trading on the NYSE American.

102.    On the next day, October 30, 2018, shares of IGC began trading over-the-counter (OTC) – or off-exchange – under the ticker symbol "IGCC." The stock price fell from $2.49 per share on October 26, 2018 to $0.56 per share on October 30, 2018, a $1.93 or 77.5% drop.

103.    The risks concealed by Defendants' misrepresentations and omissions regarding its ability to utilize a Malaysian manufacturer to transition into producing a cannabis-infused energy drink for sale in the United States had now fully materialized.

104.    An article published on the marijuana investor blog *Pot Network* on November 26, 2018 linked IGC's delisting directly to *MarketWatch*'s revelation that the Company's Nitro G operation was legally prohibited in Malaysia:[10]

> Most interestingly, IGC claimed to be working with a manufacturer in Malaysia to sell and distribute CBD-infused beverages. As MarketWatch pointed out, however, Malaysia puts people to death for cannabis possession.
>
> Consequently, shares fell by 80 percent following the report. Soon, IGC trades were halted, and the NYSE American exchange decided to delist the company ….

105.    Approximately three months later, on February 21, 2019, IGC announced that its shares would be relisted on the NYSE American.

106.    On February 26, 2019, IGC issued a press release (which it filed with the SEC on Form 8-K) stating that on November 5, 2018, Treasure Network had cancelled the Nitro G distribution agreement initially announced in the September 25, 2018 press release.  IGC claimed that it was evaluating its options with respect to the cancellation.

107.    On March 26, 2019, IGC issued a press release (which it filed with SEC on Form 8-K) stating, in relevant part, that "the Company has elected to terminate its Strategic Distributor & Partnership Agreement with Treasure Network SDN BHD, related to the sugar-free energy drink, Nitro G, effective March 26, 2019."

---

[10] *See* https://www.potnetwork.com/news/cannabis-daily-marketwatch-took-down-igc-and-wants-you-know-about-it-wholesale-prices-continue

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

108.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired IGC common stock during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures and/or materialization of concealed risks.  Excluded from the Class are Defendants herein; the officers and directors of the Company, at all relevant times; members of their immediate families; and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

109.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, IGC common stock was actively traded on the NYSE American.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by IGC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

110.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

111.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

112.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of IGC;

- whether the Individual Defendants caused IGC to issue false and misleading statements and/or omissions during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements and/or omissions;

- whether the price of IGC common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

113.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

114.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- IGC common stock is traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE American and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and members of the Class purchased, acquired and/or sold IGC common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

115.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

116.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

117.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

118.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

119.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of IGC common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire IGC common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

120.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly reports, SEC filings, press releases, and other statements and documents described above, that were designed to influence the market for IGC common stock.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about IGC finances and business prospects.

121.    By virtue of their positions at IGC, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

122.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of IGC, the Individual Defendants had knowledge of the details of IGC's internal affairs.

123.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of IGC.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to IGC businesses, operations, future financial conditions and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of IGC common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning IGC's business which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired IGC common stock at artificially inflated prices and relied upon (i) the price of IGC common stock; (ii) the integrity of the market for the IGC common stock; and/or (iii) statements disseminated by Defendants, and were damaged thereby.

124.    During the Class Period, IGC common stock was traded on an active and efficient market – the NYSE American.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of IGC common stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have

purchased or otherwise acquired shares of IGC common stock, or would not have purchased or otherwise acquired those shares at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of IGC common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of IGC common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

125.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

126.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period upon (i) the disclosure of the truth regarding Defendants' misrepresentations and omissions to the investing public during the Class Period and/or (ii) the materialization of the risks concealed from the investing public by Defendants during the Class Period.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

127.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

128.   During the Class Period, the Individual Defendants participated in the operation and management of IGC, and conducted and participated, directly and indirectly, in the conduct of IGC's business affairs.  Because of their senior positions, they knew the adverse non-public information about IGC's misstatement of the nature of its business, and its false statements

and/or omissions in its documents filed with the SEC.

129.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to IGC's operations, and to correct promptly any public statements issued by IGC which had become materially false or misleading.

130.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which IGC disseminated in the marketplace during the Class Period concerning IGC's business activities.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause IGC to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of IGC within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of IGC common stock.

131.    Each of the Individual Defendants, therefore, acted as a controlling person of IGC.  By reason of their senior management positions and/or being directors of IGC, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, IGC to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of IGC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

132.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by IGC.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the class representative;

B.      requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  May 13, 2019                                    Respectfully submitted,

                                                        /s/ Daniel S. Sommers
                                                        Steven J. Toll (Md. Bar No. 15824)
                                                        Daniel S. Sommers (Md. Bar No. 15822)
                                                        S. Douglas Bunch
                                                        **COHEN MILSTEIN SELLERS &**
                                                        **    TOLL PLLC**
                                                        1100 New York Avenue N.W.
                                                        Suite 500, East Tower
                                                        Washington, DC 20005
                                                        Telephone:  (202) 408-4600
                                                        Facsimile:  (202) 408-4699
                                                        Email: stoll@cohenmilstein.com
                                                                 dsommers@cohenmilstein.com
                                                                 dbunch@cohenmilstein.com

                                                        *Liaison Counsel for Lead Plaintiff*

                                                        **POMERANTZ LLP**
                                                        Jeremy A. Lieberman
                                                        J. Alexander Hood II
                                                        Jonathan Lindenfeld
                                                        600 Third Avenue, 20th Floor

New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        jlindenfeld@pomlaw.com


**POMERANTZ LLP**
Patrick V. Dahlstrom
Louis C. Ludwig
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 229-8811
Email:  pdahlstrom@pomlaw.com
        lcludwig@pomlaw.com


**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Joshua Baker
101 Greenwood Avenue, Suite 440
Jenkintown, Pennsylvania 19046
Telephone:  (215) 600-2817
Facsimile:  (212) 202-3827
Email:   pkim@rosenlegal.com
         jbaker@rosenlegal.com


**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com

***Attorneys for Lead Plaintiff***