## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

| | | |
|---|---|---|
| **ALDE-BINET TCHATCHOU**, on behalf of himself and all others similarly situated | * | |
| | * | |
| **Plaintiff** | * | |
| **v.** | * | **Civil No.: PWG-18-3396** |
| **INDIA GLOBALIZATION CAPITAL INC.**, *et al.*, | * | **Consolidated Case Class Action** |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM AND ORDER

This is a consolidated securities class action, in which Plaintiffs seek to recover damages caused by alleged violations of federal securities laws, specifically Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5. Consol. Am. Compl., ECF No. 45. Defendant, India Globalization Capital Inc. ("IGC") is a Maryland company whose common stock trades on the NYSE American exchange under the symbol "IGC." *Id.* at ¶ 19. The members of Lead Plaintiff, IGC Investor Group,[1] acquired IGC's common stock between September 26, 2018 and October 26, 2018. *Id.* at ¶¶ 1, 18. In addition to suing IGC, Plaintiffs also sue Defendant Ram Mukunda, IGC's Executive Chairman, Chief Executive Officer, and President, and Claudia Grimaldi, IGC's Principal Financial Officer. *Id.* at ¶¶ 20-21. Mukunda and Grimaldi are collectively referred to as the "Individual Defendants."

---

[1]    Lead Plaintiff members are Victor Blahut, Charles Dewayne Goss, Sherry Phyllis Goss, Melissa Culbertson, Timothy Culbertson, Due Tran, and Yong P. Saito. Consol. Am. Compl. 2, ECF No. 45.

Plaintiffs allege that IGC attempted to take advantage of a hot market trend by promoting its entrance into a marijuana-based products business in partnership with a manufacturer located in Malaysia, causing its stock price to jump six-fold.  However, when the truth was revealed that the product was illusory, and it was illegal to manufacture marijuana-based products in Malaysia, IGC's stock price plummeted, causing investors to lose millions of dollars.  Multiple lawsuits followed, including the two related suits that form this consolidated class action.  Currently pending before me is Defendants' motion to dismiss the Consolidated Amended Complaint for failure to plausibly allege a violation of federal securities laws.  Mot., ECF No. 61.[2]  Because Plaintiffs allege sufficient facts to create a plausible inference of securities fraud, Defendants' motion is DENIED.

## BACKGROUND

For purposes of considering the Defendants' dismissal motion, this Court takes all well-pleaded facts alleged in the Consolidated Amended Complaint as true.  *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).  Additionally, I may consider documents attached as exhibits to the complaint and the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed, as well as documents that are explicitly incorporated into the complaint by reference.  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).[3]

---

[2]     Plaintiffs filed a response in opposition, ECF No. 69, and Defendants filed a reply, ECF No. 70.  A hearing is unnecessary.  Loc. R. 105.6 (D. Md. 2018).
[3]     I may also consider facts and documents subject to judicial notice.  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).  The documents considered and how they are used are discussed in detail below.

IGC was organized in Maryland in 2005 as a "blank check company"[4] for the purpose of acquiring businesses, primarily in India. Consol. Am. Compl. ¶ 24. It completed its initial public offering on March 8, 2006. *Id.* at ¶ 28. Over the next fourteen years, Plaintiffs allege that IGC "dabbled" in a string of disparate business lines, which included trading of infrastructure commodities like steel and iron ore, the rental of heavy equipment, indoor farming facilities, extracting medical grade oils from plants, and developing methods to use blockchain[5] for product identification. *Id.* at ¶¶ 26-27, 29-33, 41. In its 2018 annual report, IGC stated that its "main focus [wa]s to develop and commercialize cannabinoid based alternative therapies for indications such as Alzheimer's disease, Parkinson's disease, and pain" and that "[i]ts lead product [wa]s Hyalolex, an alternative oral therapy for the treatment of symptoms associated with Alzheimer's disease." *Id.* at ¶ 35. That same year, in its SEC filing for the quarter ending June 30, 2018, it posted a loss of $512,296 on revenue of $1.5 million. *Id.* at ¶ 36. An analyst report in September 2018 described IGC as "in need of a cure." *Id.* at ¶ 39.

On September 25, 2018, IGC issued a press release announcing "that it was entering 'the Hemp/CBD-infused energy drink space' and would begin producing a sugar-free cannabis drink called 'Nitro G.'" *Id.* at ¶ 46; *see also id.* at ¶ 78; Defs.' Ex. B, September 25, 2018 Press Release, ECF No. 61-3. Although the press release did not include the name of the company that IGC was to partner with, it was later revealed to be a Malaysian company, Treasure Network. *Id.* at ¶ 71-

---

[4]     A blank check company is a development-stage company with no specific business plan other than to engage in mergers and acquisitions. Consol. Am. Compl. ¶ 25; *see also* 17 C.F.R. § 210.1-02(h); 15 U.S.C. § 77g(b)(3).

[5]     Blockchain is defined as "a digital database containing information (such as records of financial transactions) that can be simultaneously used and shared within a large decentralized, publicly accessible network." Merriam-Webster. (n.d.). Blockchain. In *Merriam-Webster.com dictionary*. Retrieved January 28, 2021, from https://www.merriam-webster.com/dictionary/blockchain.

72.[6]  The same day, IGC commenced an "at-the-market" (or "ATM") stock offering.[7]  *Id.* at ¶ 48.

IGC's stock began rising in response to the announcement, and by October 2, 2018, when it closed

its ATM offering, IGC's stock price hit a high of $14.58 on volume of 19 million shares, over six

times higher than a week earlier, when the price was $2.33 per share.[8]  *Id.* at ¶¶ 47, 50, 79.  IGC's

ATM offering raised $30 million of capital at $5.30 per share.  *Id.* at ¶ 50.

Plaintiffs allege that beginning the morning of October 2, 2018, "the truth" about IGC's

announcement and stock offering began to emerge.  *Id.* at ¶¶ 85-86.  First, on October 2, 2018,

Citron Research, a stock commentary website, labeled IGC "the poster child of a cannabis bubble"

in a Twitter post, cautioning investors that it was all hype, recommending the stock be sold short.

*Id.* at ¶¶ 85-86.  By midday on October 2, 2018, the Citron tweets were being reported on the

financial blog *Seeking Alpha*.  *Id.* at ¶ 87.  Market observers followed up with an uploaded photo

of the address listed in IGC's June 21, 2018 annual report that showed an image of a small

suburban home identified as a closed child-care center.  *Id.* at ¶ 88.  By October 3, 2018, IGC's

share price fell $4.15, to close at $8.85.  *Id.* at ¶ 89.  Plaintiffs allege that IGC's September 25,

2018 press release indicated that IGC would partner with a manufacturer in Malaysia,[9] but

manufacturing CBD-based beverages was, and is, illegal under Malaysia's drug laws.  *Id.* at ¶¶ 55-

56.  Plaintiffs allege that IGC failed to disclose this fact, which was only revealed to investors

---

[6]      IGC executed the partnership agreement with Treasure Network on September 25, 2018.  Mot. Mem. 5.

[7]      "An ATM offering is a type of secondary offering of stock utilized by publicly traded companies in order to raise capital over time."  Consol. Am. Compl. ¶ 49 (apparently citing https://en.wikipedia.org/wiki/Follow-on_offering).  IGC notes that on April 2, 2018, it filed an SEC Form S-3 shelf Registration Statement seeking to raise up to $30 million, and it became effective on May 11, 2018.  Mot. Mem. 3, n.1, ECF No. 61-1.

[8]      IGC's stock closed at $13.00 per share on October 2, 2018.  Consol. Am. Compl. ¶ 79.

[9]      IGC asserts that *MarketWatch* falsely claimed that IGC was going to use a Malaysian company to manufacture the intended CBD-infused energy drink in Malaysia, presumably misreading the September 25, 2018 Press Release.  Mot. Mem. 1.

upon publication of the *MarketWatch* October 4, 2018 report identifying numerous "red flags." *Id.* at ¶¶ 56, 90-94.  Following publication of the *MarketWatch* report, IGC's stock price fell from $6.41 per share on October 4, 2018 to $4.05 per share on October 5, 2018.  *Id.* at ¶ 95.

IGC did not respond directly to the *MarketWatch* report, but on October 5, 2018, it posted on Twitter that its staff worked from the corporate office in Potomac Maryland or nearby virtual offices, and it also maintained offices in the State of Washington.  *Id.* at ¶¶ 96-98.  And on October 6, 2018, IGC posted on Twitter: "Our growth and expansion strategies are to commercialize and license our products in states and countries where we can legally enter the market."  *Id.* at ¶ 81.  Plaintiffs allege that IGC's posts were materially false and misleading.  *Id.* at ¶ 99.

On October 29, 2018, the NYSE American exchange announced it was commencing proceedings to delist IGC's common stock, and trading was suspended.  *Id.* at ¶¶ 100-101.  On October 30, 2018, IGC shares began trading over-the-counter and the price fell to $0.56 per share. *Id.* at ¶ 102.  IGC appealed the NYSE decision, and about three months later, on February 21, 2019, IGC announced that its shares would be relisted on the NYSE American exchange.  *Id.* at ¶ 105.  On February 26, 2019, IGC issued a press release stating that on November 5, 2018, Treasure Network had cancelled the Nitro G distribution agreement that had initially been announced in the September 25, 2018 Press Release.  *Id.* at ¶ 106.  On March 26, 2019, IGC issued a press release stating  that it had elected to terminate its Strategic Distributor & Partnership Agreement with Treasure Network, related to the sugar-free energy drink, Nitro G.  *Id.* at ¶ 107.

On November 2, 2018, two class action lawsuits were filed accusing IGC and certain executives of making false or misleading statements in violation of Section 10(b) of the Exchange Act and Rule 10b-5, and also accusing certain executives of aiding and abetting the fraud in violation of Section 20(a) of the Exchange Act.  *See Harris-Carr v. India Globalization Capital,*

*Inc.*, No. 18-3408-GJH; *Tchatchou v. India Globalization Capital Inc.*, No. 18-3396-PWG.[10]  I

granted the motions to consolidate the cases and named IGC Investor Group as Lead Plaintiff.

Mem. Op., ECF No. 37; Order, ECF No. 38.  The purported class consists of all persons other than

Defendants who purchased or otherwise acquired IGC common stock during the Class Period,

which is defined as September 26, 2018 to October 26, 2018 inclusive.  Consol. Am. Compl. ¶ 1.

Plaintiffs bring two causes of action against Defendants:

- Count I – Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants;

- Count II – Violations of Section 20(a) of the Exchange Act Against the Individual Defendants.

*Id.* at ¶¶ 117-32.  After an unsuccessful attempt to resolve their disputes through private mediation,

Defendants sought permission to file a dismissal motion.  *See* Joint Status Report, ECF No. 53;

Pre-motion Ltr., ECF No. 54. Plaintiffs declined the opportunity to further amend the complaint,

and Defendants filed the pending Motion to Dismiss on October 11, 2019.  Defendants argue that

Plaintiffs' allegations of falsity and scienter are plainly insufficient to plausibly plead a material

false or misleading statement, scienter, or loss causation, and Defendants seek dismissal with

prejudice and without leave to amend.  Mot. Mem. 2; Reply 1, ECF No. 70.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it

fails to state a claim upon which relief can be granted."  *Velencia v. Drezhlo*, Civil Action No.

RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012).  This rule's purpose "'is to test

the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a

---

[10]     A related consolidated derivative action, *Gene Erny v. Ram Mukunda, et al.*, DKC-18-3698 was resolved by settlement on June 30, 2020.

claim, or the applicability of defenses.'" *Id.* (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)).  To that end, the Court bears in mind the requirements of Rule 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) when considering a motion to dismiss pursuant to Rule 12(b)(6).  Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79.  *See Velencia*, 2012 WL 6562764, at *4 (discussing standard from *Iqbal* and *Twombly*).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

Additionally, a claim for securities fraud must meet the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 452 (D. Md. 2019) (citing *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 634 (D. Md. 2010)).  Rule 9(b) states that "in alleging a fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake." Fed. R. Civ. P. 9(b). Such allegations of fraud typically "include the 'time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby.'" *Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC-11-3758, 2013 WL 247549, at *5 (D. Md. Jan. 22, 2013) (quoting *Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F. Supp. 2d 298, 313-14 (D. Md. 2000)); *see Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781-82 (4th Cir. 2013).

However, Rule 9(b) permits "intent, knowledge, and other conditions of a person's mind [to] be alleged generally." Fed. R. Civ. P. 9(b).

To further "strengthen existing pleading requirements," the PSLRA requires plaintiffs to (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-22 (2007) (quoting 15 U.S.C § 78u-4(b)(1), (b)(2); H.R. Conf. Rep. No. 104–369, p. 41 (1995), U.S. Code Cong. & Admin. News 1995, p. 730). Courts have been instructed to dismiss any securities fraud complaint that does not plead a strong inference of scienter. *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008).

When reviewing a dismissal motion in the securities fraud context, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. A court may take judicial notice of "fact[s] that [are] not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Additionally, a court may "consider documents that are explicitly incorporated into the complaint by reference." *Goines,* 822 F.3d at 166; *see also Sposato v. First Mariner Bank*, No. CCB-12-1569, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013) ("The court may consider documents attached to the complaint, as well as documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed."); *CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the

pleading for all purposes.").  Moreover, where the allegations in the complaint conflict with an attached written instrument, "the exhibit prevails." *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991); *see Azimirad v. HSBC Mortg. Corp.*, No. DKC-10-2853, 2011 WL 1375970, at *2-3 (D. Md. Apr. 12, 2011).

## ANALYIS

### I.  Exhibits Considered

First, I shall begin by determining which exhibits are properly under consideration. Defendants submitted eight exhibits with their dismissal motion, but Plaintiffs argue that the exhibits have not been authenticated, are not incorporated by reference, or are not proper subjects of judicial notice.  *See* Pls.' Resp. 9-10. In particular, Plaintiffs assert that Defendants' Exhibits C and H can only be considered if I convert the dismissal motion to a motion for summary judgment. *Id.* at 10, n.3 (citing Fed. R. Civ. P. 12(d)).

The following exhibits were attached to Defendants' motion:

- Exhibit A, ECF No. 61-2, SEC Form S-3 Registration Statement;

- Exhibit B, ECF No. 61-3, IGC Press Release, September 25, 2018;

- Exhibit C, ECF No. 61-4, Strategic Distributor & Partnership Agreement between Treasure Network and IGC;

- Exhibit D, ECF No. 61-5, IGC May 11, 2018 Prospectus Supplement for ATM offering of $15 million common stock, dated September 24, 2018;

- Exhibit E, ECF No. 61-6, IGC May 11, 2018 Prospectus Supplement for ATM offering of $15 million common stock, dated October 1, 2018;

- Exhibit F, ECF No. 61-7, SEC Form 10-Q, for quarterly period ended June 30, 2018;

- Exhibit G, ECF No. 61-8, SEC Form 10-Q, for quarterly period ended September 30, 2018;

- Exhibit H, ECF No. 61-9, IGC Press Release, February 21, 2019.

I may take judicial notice of matters of public record, such as the SEC filings and prospectuses, as well as press releases. *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 653 n.7 (D. Md. 2012), *aff'd sub nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014).  When a court takes judicial notice of a public record, it takes notice that the record exists, or that it was filed with the agency, or that the information was publicly available.[11]  *Id.*  However, if a court considers generally known or undisputed facts at the motion to dismiss stage, it must identify the fact or facts it is noticing, and the facts must be construed "in the light most favorable to the plaintiffs." *Zak*, 780 F.3d at 607.  Importantly, the content of a noticed document may not be used to contradict well-pleaded allegations in the complaint. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018).  Therefore, I shall identify any facts judicially noticed from any of these exhibits attached to Defendants' dismissal motion, and of course, any such facts noticed shall be construed in the light most favorable to the Plaintiffs.

Additionally, Exhibits B and G—the September 25, 2018 Press Release, and SEC Form 10-Q for the period ended September 30, 2018—will be considered because they are specifically incorporated by reference in Plaintiffs' complaint.  Plaintiffs' allegations of false statements must be analyzed in context, especially when considering whether there is a strong inference of scienter. *Tellabs*, 551 U.S. at 322; *see also Khoja*, 899 F.3d at 1002 ("[Incorporation by reference] prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims.").

Defendants' Exhibit C is the Strategic Distributor & Partnership Agreement between Treasure Network and IGC.  Treasure Network Agreement, ECF No. 61-4.  Defendants assert that

---

[11]      Defendants note that with regard to Exhibits A, D, and E, the Court need take judicial notice "only as to the fact of their filing," relying on them only to establish the dates related to the two ATM offerings. Reply 3, n.3.

I may consider Exhibit C "because it is 'integral to and explicitly relied on in the complaint' and there can be no reasonable challenge to its authenticity." Mot. Mem. 5, n.3 (quoting *Zak*, 780 F.3d at 606-07).  Plaintiffs argue that it is "entirely unauthenticated, appears to be a photocopy, and contains stray, handwritten notations," and it "is inappropriate for judicial notice." Pls.' Resp. 13-14.  Plaintiffs make multiple references to the September 25, 2019 press release that announced the partnership with Treasure Network, including quoting a substantial portion of the press release, alleging that the announced partnership was with Treasure Network, although it was not explicitly named, and alleging that it contains false and misleading statements.  *See, e.g.*, Consol. Am. Compl. at ¶¶ 46, 55, 71-78, 80.  Arguably, the agreement is integral to Plaintiffs' allegations, and it is referenced in the complaint.  However, Plaintiffs do challenge the document's authenticity, and it is not a matter of public record.  Therefore, I shall accept only the existence of the document as referenced in the complaint, but I shall not consider the content of the document for any purpose.

Defendants' Exhibit H is an IGC Press Release dated February 21, 2019 in which IGC announced that it had successfully appealed the NYSE American exchange's decision to delist IGC's common stock.  February 19 Press Release, ECF No. 61-9.  As already discussed, I shall take judicial notice of Exhibit H as a press release that was a public document as described above.

## II.    Count I – Exchange Act Section 10(b) and Rule 10b–5

Plaintiffs allege claims under Section 10(b) of the Exchange Act and Rule 10b–5.  "Those provisions act to protect the integrity of the market in securities and prohibit fraud in connection with the purchase or sale of a security." *Cozzarelli*, 549 F.3d at 623 (citing 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5).  Section 10(b) of the Act prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the sale of a security in violation of SEC rules.

15 U.S.C. § 78j(b). "Rule 10b–5 encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

Under a Section 10(b) cause of action, a plaintiff must establish six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 2027 (2018) (quoting *Stoneridge*, 552 U.S. at 157). Defendants assert that they made no false or misleading statement when the alleged statements are considered in "the full context in which they were made." Mot. Mem. 15 (quoting *Gasner v. Bd. of Supervisors of the Cty. of Dinwiddie, Va.*, 103 F.3d 351, 358 (4th Cir. 1996)). They also assert that any statements made were not material, Plaintiffs have not properly pleaded scienter under the PSLRA's heightened pleading standard, and Plaintiffs cannot plead loss causation. *Id.* at 22, 24, 32. I shall address each in turn.

The PSLRA's heightened pleading standard is applicable to pleading an actionable misrepresentation or omission as well as adequately alleging scienter. *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007). The "complaint must include '*each statement* alleged to have been misleading, *the reason* or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state *with particularity all facts* on which that belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)).

### A.    Material Misleading Statements

#### 1.    September 25 Press Release Statements

Plaintiffs identified the following "false and misleading statements of material fact" in IGC's September 25, 2018 press release:

- IGC "ha[d] executed a distribution and partnership agreement" for Nitro G with an unnamed partner, and, as a result, had obtained "the rights to market" Nitro G in "the U.S., Canada, Mexico and South America."

- "By combining the experience of IGC with Hyalolex with the manufacturer in Malaysia, we potentially bring together unique expertise in microencapsulation, solubility, infusion, controlled dose delivery, and sugar free processes, among others."

Pls.' Resp. 17-18 (citing Consol. Am. Compl. ¶ 78).   According to Plaintiffs, these statements are "false and misleading because IGC could not manufacture its CBD-based product in Malaysia, where the manufacture and possession of cannabis-based products is punishable by death." *Id.* at 18.   Plaintiffs add that Defendants' misleading claim is further compounded by its failure to disclose material facts such as that neither IGC nor its partner was a licensed manufacturer in Malaysia, its new partner was not experienced and operated under IGC's substantial control, and that CBD-infused Nitro G was not an approved or registered product under Malaysian law. *Id.* (citing Consol. Am. Compl. ¶ 80).

I have reviewed the September 25, 2018 press release, which I consider as incorporated by reference into the complaint. *See* Mot. Ex. B.   The title "IGC to Enter the Hemp/CBD-Infused Energy Drink Space" and the statement that it planned to create a branded, hemp/CBD-infused version of the Nitro G energy drink in the future are forward-looking statements. Under the PSLRA, a "forward-looking statement" is defined to include "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," as well as "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer", and "a statement of future economic performance." 15 U.S.C. § 77z–2(i)(1); 15 U.S.C. § 78u–5(i)(1).   Under the PSLRA safe harbor, forward-looking

statements are protected from liability if they contain "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i).  Even if a forward-looking statement is not accompanied by cautionary language, liability only attaches if the speaker had actual knowledge that it was false when made. 15 U.S.C. § 78u–5(c)(1)(B)(i).  While there was no inclusion of a meaningful cautionary statement, neither were there any performance-related predictions or overstated expectations, but only a statement of intention, and some general projections of the global energy drinks market.  Forward-looking statements are not actionable if they do not guarantee any particular results. *See Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993).  The press release did include language regarding forward-looking statements, referring the reader to IGC's Form 10K and other reports filed with the SEC. Mot. Ex. B.

The Press Release does not specifically announce that IGC plans to manufacture its new hemp/CBD-infused version of Nitro G in Malaysia, but it does create a misleading inference that it has a manufacturer in Malaysia.  This is misleading in two ways: (1) that there is a manufacturer; and (2) the manufacturer is located in Malaysia.  IGC argues that the place of manufacture is simply not material to a potential investor's decision to purchase IGC's stock, and Plaintiffs' allegations reveal that it was the hype around "the then-hot marijuana stock bandwagon" that led to the jump in IGC's stock price.  Consol. Am. Compl. ¶¶ 3, 44-47.  Plaintiffs note that location is actually material because the Press Release also reveals that the drink could not be produced in the United States under current federal law.  Pls.' Resp. 22.

The Fourth Circuit has stated that Section 10(b) and Rule 10b–5 "decidedly do not prohibit any misrepresentation—no matter how willful, objectionable, or flatly false—of immaterial facts, even if it induces reactions from investors that, in hindsight or otherwise, might make the

misrepresentation appear material." *Greenhouse v MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004). In fact, "even lies are not actionable" when an investor "possesses information sufficient to call the [mis]representation into question." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir. 1999). Liability attaches under the federal securities laws "only when there is a 'substantial likelihood' that an alleged misrepresentation 'significantly altered the total mix of information' a reasonable investor (the market) possesses." *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, (1976)). Materiality is an objective concept, "involving the significance of an omitted or misrepresented fact to a reasonable investor." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682-83 (4th Cir. 1999) (quoting *Gasner v. Board of Supervisors*, 103 F.3d 351, 356 (4th Cir. 1996)).

Plaintiffs assert that it is inappropriate to consider materiality at this stage of litigation, because materiality is a question of fact for the jury. Mot. Mem. 20 (citing *Dunn v Borta*, 369 F.3d 421, 427 (4th Cir. 2004)). However, the *Dunn* court, reviewing dismissal of a complaint, went on to state that courts do review a complaint to determine if it "presents a plausible jury question of materiality." 369 F.3d at 427. The Fourth Circuit further emphasized that "[n]o shortage of cases, however, make clear that materiality may be resolved by a court as a matter of law." *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 657 (4th Cir. 2004) (citations omitted). In essence, a court must "decide whether a reasonable jury could find it 'substantially likely' that a reasonable investor would believe that the disclosure of the untrue fact (s) (and nothing but the disclosure of the untrue fact(s)) would alter the 'total mix' of information available to the reasonable investor." *Id.*

Defendants argue that whether it was legal to manufacture the product in Malaysia was publicly-available information. However, the identity of IGC's new partner was non-public

information, and only IGC knew that there was no manufacturer.  Therefore, the total mix of

information available to the reasonable investor did not include whether the new partner was a

manufacturer, whether there was a manufacturer for the product, or whether the product could be

legally manufactured, i.e., it was a real—not illusory—product.  The public disclosure that

manufacture in Malaysia, as the press release implied, was illegal, and that the product was

illusory, resulted in a sudden drop in stock prices.  At a minimum, resolving doubts in favor of

Plaintiffs, the alleged facts present a plausible jury question of materiality, although this is a close

question.  Accordingly, I conclude that Plaintiffs have sufficiently pleaded that Defendants' press

release inference of a manufacturer was materially misleading.

### 2.    October 16 Form 10-Q

Plaintiffs allege that IGC's Quarterly Report filed with the SEC on October 16, 2018 falsely

promoted IGC's prospects "based on its purported development of a CBD-infused Nitro G."  Pls.'

Resp. 18 (citing Consol. Am. Compl. ¶¶ 82-83).  Specifically, Plaintiffs cite this statement, which

refers back to the September 25 Press Release:

> On October 4, 2018, we filed a provisional method and
> composition patent application (IGC-509) with the U.S. Patent and
> Trademark Office (USPTO) for the treatment of fatigue and energy
> restoration. This patent filing is one of a series of steps in the
> Company's development and commercialization plan to support the
> creation of a branded, hemp/CBD sugar-free energy drink, which
> was previously disclosed by the Company on September 25, 2018.

*Id.* (citing Consol. Am. Compl. ¶ 82).  Plaintiffs allege that the statement is "false and misleading

for the same reasons as the initial press release," and also because the "hemp-infused Nitro G was

an illusory product."  *Id.* at 19.  I have reviewed the October 16 Form 10-Q, which I consider

incorporated by reference into the complaint.  The complained-of statement is included on page

18 under Note 24 – Subsequent Events.  Mot. Ex. G at 24.  The statement is a factual representation

regarding a patent filing that Plaintiffs do not allege is untrue.  Plaintiffs fail to plausibly allege that the October 16 Form 10-Q contained a false statement.

### 3.    October 6 Tweet

Plaintiffs allege that Defendants' posting on Twitter on October 6, 2018 is a false and misleading statement: "[o]ur growth and expansion strategies are to commercialize and license our products in states and countries where we can legally enter the market." Pls.' Resp. 19 (citing Consol. Am. Compl. ¶ 98).  Plaintiffs allege that the statement is false and misleading because it "touted the legality of IGC's operations." *Id.* (citing Consol. Am. Compl. ¶ 99).  Plaintiffs argue that the Tweet is a false statement because it did not correct the *MarketWatch* report, but "only served to further the false statements made in the September 25, 2018 press release." *Id.* at 19-20.  The October 6 Tweet is a simple statement that IGC intends to commercialize a product where it can legally do so.  Plaintiffs cannot transform this statement into a false and misleading statement by simply alleging that IGC actually intended to create a product where it was not legal to do so.

### B.    Scienter

Plaintiffs must also adequately plead a "strong inference" of scienter, which is no small burden.  *See Tellabs*, 551 U.S. at 313.  To establish scienter, a plaintiff must prove that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 319.  "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.  Further, plaintiffs must "plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Id.* at 328.  Courts "consider the scienter allegations holistically and accord those allegations the inferential weight warranted by context and common sense." *Zak*, 780 F.3d at 606.

Notably, when it comes to pleading scienter, Plaintiffs are not entitled to have all reasonable inferences construed in their favor, but must "plead sufficient facts to raise a strong inference of scienter." *Under Armour*, 342 F. Supp. 3d at 689, n.18 (quoting *Teachers'*, 477 F.3d at 172). Plaintiffs' allegations must raise a strong inference that Defendants knew or were reckless in disregarding the true facts when making the false or misleading statements. *Id.* "If the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents." *Teachers'*, 477 F.3d at 184.

Plaintiffs argue that Defendants' own explanations for their statements illustrates that they knew facts that contradicted their public statements, thus making them reckless. Pls.' Resp. 25-26. Plaintiffs allege that Defendants issued the Press Release knowing that there was no manufacturer for an illusory product, which is "classic evidence of scienter." *Id.* at 25 (quoting *S.E.C. v. Pirate Investor LLC*, 580 F.3d 233, 243 (4th Cir. 2009)). Plaintiffs allege that the senior managers and directors of IGC had knowledge of the details of IGC's internal affairs. Consol. Am. Compl. ¶ 122. The senior managers and directors were in a position to control the content of IGC's statements. *Id.* at ¶¶ 121-23, 130. Plaintiffs add that the timing of the stock offering on the same day as the Press Release leads to an inference of scienter, and they allege that Defendants purposefully planned to issue misleading statements to artificially inflate IGC common stock. *Id.* at ¶¶ 119-21, 124; Pls.' Resp. 28. While Plaintiffs' complaint must satisfy the more stringent requirements imposed on securities fraud pleadings, an inference of scienter may be persuasive where there are allegations that the defendants made the false or misleading statements either intentionally or with deliberate recklessness. *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 633 (E.D. Va. 2000).

Additionally, Plaintiffs allege that motive—Defendants "badly needed the infusion of funds from the offering"—supports an inference of scienter.  Pls.' Resp. 27.  Certainly, "a strong inference of fraud does not arise merely from seeking capital to support a risky venture.  Indeed, the motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud."  *Cozzarelli*, 549 F.3d at 627.  However, Defendants' dire need for funds is probative and adds one more cautionary flag to the overall context within which the Court holistically views the inferences of scienter when compared to any competing inferences.  *See Pirate Inv'r*, 580 F.3d at 243 (holding that the district court did not clearly err in finding that the plaintiffs had established a strong inference of scienter, where the individual defendant had actual knowledge that his statement was false at the time he made it as well as the "clear financial motive for the misrepresentations").  Plaintiffs' allegations of a pattern of conduct (for example, the blockchain claims[12]) also support an inference that Defendants acted with deliberate knowledge and intent to raise capital by making misleading representations.  *See* Pls.' Resp. 28-29; Consol. Am. Compl. ¶¶ 41-43.

In comparison, Defendants do not offer a compelling competing inference.  Rather, they argue only that the partnership agreement was confidential, which prevented them from revealing substantial information about their plans.  Reply 16.  Defendants state that they planned to manufacture in North America, but they do not offer an explanation for the misleading statement in the Press Release nor why they did not issue clarifying statements when it was apparent that the public had "misinterpreted" the statements in the Press Release.  Although each of Plaintiffs' allegations standing alone may be insufficient to support a strong inference of scienter, looked at

---

[12]      Defendants succeeded at achieving a stock price bump with their announcement about blockchain but did not deliver the promised technology.  Consol. Am. Compl. ¶¶ 40-43.

holistically, as the law requires the Court to do, the allegations are enough to suggest a strong inference of scienter at this motion to dismiss stage. Whether the same can be said after discovery has been taken remains to be seen.

### C. Loss Causation

"To survive a motion to dismiss, a securities fraud plaintiff must adequately allege that 'defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss.'" *In re Municipal Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 645 (D. Md. 2012) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). To achieve this, plaintiffs must show that defendant's conduct was a substantial cause of the injury but not the only cause. *Id.*; *see also Teachers'*, 477 F.3d at 186. The loss-causation element can be satisfied if "the alleged 'misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" *Id.* at 645-46 (quoting *In re IMAX Sec. Litig.*, 587 F.Supp.2d 471, 485 (S.D.N.Y. 2008)). Under this theory, plaintiffs may allege that the truth was gradually revealed through a series of partial disclosures that, all together, prompted the stock price to fall. *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 625 (S.D.W. Va. 2012) (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009)).

Here, Plaintiffs allege that after Defendants' Press Release's misleading statements, Citron Research partially revealed that IGC's product was illusory— "All hype." Consol. Am. Compl. ¶ 85. The Citron Research tweets were immediately reported on the financial blog, *Seeking Alpha*. *Id.* at ¶ 87. Within days, *MarketWatch* published a report revealing an "alarming number of red flags" including that IGC's chief scientific officer had previously been charged with falsifying data. *Id.* at ¶¶ 90-91. Plaintiffs also allege that the report revealed that "IGC's proposal to manufacture Nitro G in Malaysia – the basis for its astronomical stock price rise and ATM offering

that netted $30 million for the Company just days earlier – was flatly illegal." *Id.* at ¶ 92.  Further, the report indicated that IGC's executives were not responding to investigative inquiries. *Id.* at ¶ 94.  Plaintiffs allege that IGC's stock price fell from $6.41 per share on October 4, 2018 to $4.05 per share on October 5, 2018 following publication of the *MarketWatch* report.  *Id.* at ¶ 95.  Then, on October 29, 2018, the NYSE American announced it was delisting IGC's common stock, and the complaint quotes the announcement, including: "the issuer has substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical," and "the Company or its management have engaged in operations which, in the opinion of the Exchange, are contrary to the public interest."  *Id.* at ¶ 100.  Plaintiffs allege that following this news, IGC common stock ceased trading, and the stock price fell from $2.49 per share on October 26, 2018 to $0.56 per share on October 30, 2018.  *Id.* at ¶¶ 101-102.

Defendants argue that these reports did not actually reveal any non-public information, so they were not "disclosures" but merely negative opinions.   Mot. Mem. 33-34, Reply 18-20. However, Plaintiffs alleged that the information was not known or available to the market prior to publication, and in fact, had been deliberately concealed.  Consol. Am. Compl. ¶¶ 23, 56, 119-23. Plaintiffs have alleged detailed facts to support their theory of loss causation, and their theory is not facially implausible.   There may be a weak connection, but "the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Municipal Mortg.*, 876 F. Supp. 2d at 647 (quoting *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008)).

Accordingly, Plaintiffs have adequately alleged that Defendants intentionally or recklessly made a material, misleading statement that, when the truth was disclosed, resulted in economic loss.  Count I shall survive Defendants' dismissal motion.

## III.    Count II – Exchange Act Section 20(a)

Under Section 20(a) of the Exchange Act, liability is imposed on each person who "controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). Plaintiffs allege that the Individual Defendants had the power to influence and control IGC's decision-making, including the control over "the contents of the various reports, press releases and public filings which IGC disseminated in the marketplace."  Consol. Am. Compl. ¶ 130.  Plaintiffs allege that the Individual Defendants are, therefore, liable under Section 20(a) of the Exchange Act for IGC's violations.  *Id.* at ¶ 131-32.

Defendants argue only that Plaintiffs failed to adequately plead the underlying 10(b) violation.  Section 20(a) liability is derivative of Section 10(b), so a claim of control person liability must allege a predicate violation of Section 10(b).  *Yates*, 744 F.3d at 891, n.8.  Because Plaintiffs have adequately pleaded a viable underlying 10(b) or Rule 10b–5 violation, they have pleaded a predicate offense on which to base control person liability.  Therefore, Count II also survives Defendants' dismissal motion.

## CONCLUSION

Although this is a close case, the Plaintiffs have adequately pleaded both Count I and Count II.  Therefore, I shall deny Defendants' motion to dismiss, and direct Defendants to answer the Consolidated Amended Complaint.

**ORDER**

For the foregoing reasons, it is, this 28th day of January, 2021, hereby ORDERED that:

1. Defendants' Motion to Dismiss Consolidated Amended Complaint for Violation of Federal Securities Laws, ECF No. 61, is DENIED;

2. Defendants shall file their Answer to the Consolidated Amended Complaint, ECF No. 45, on or before February 15, 2021, after which the Court will enter a Scheduling Order and schedule a Federal Rule of Civil Procedure 16 conference with the parties to discuss further trial proceedings.


_____/S/_____
Paul W. Grimm
United States District Judge